PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-1925
_____

ANDREW R. PERRONG

v.

MATTHEW BRADFORD;
CLEO COMMUNICATIONS

Matthew Bradford,
            Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil No. 2:23-cv-00510
District Judge: Honorable Joshua D. Wolson

_____

ARGUED: May 22, 2025

Before:  RESTREPO, MONTGOMERY-REEVES, and
SCIRICA, *Circuit Judges*.

(Filed:  October 6, 2025)

Karl S. Myers
Stevens & Lee
555 City Avenue
Suite 1170
Bala Cynwyd, PA  19004
    *Counsel for Appellant*

Kenneth L. Joel
Office of General Counsel
Commonwealth of Pennsylvania
30 N 3rd Street
Harrisburg, PA  17101
        *Counsel for Amicus Appellant Governor of Pennsylvania*

Crystal H. Clark
Shannon A. Sollenberger
Senate of Pennsylvania
Main Capitol
Harrisburg, PA  17120

Rodney A. Corey
Pennsylvania House of Representatives
P.O. Box 202228
Suite B-6 Main Capitol
Harrisburg, PA  17120
        *Counsel for Amicus Appellants Pennsylvania House of Representatives Republican Caucus, Pennsylvania Senate Democratic Caucus and Pennsylvania Senate Republican Caucus*

Andrew R. Perrong
Perrong Law
1657 The Fairway
No. 131
Jenkintown, PA  19046
    *Counsel for Appellee*

————————————

OPINION OF THE COURT

————————————

SCIRICA, *Circuit Judge*.

This case concerns a question of first impression: whether the Telephone Consumer Protection Act ("TCPA") prohibition on robocalls restricts state legislators from making automated and pre-recorded calls in connection to their legitimate government functions.

Matthew Bradford, a Member of the Pennsylvania House of Representatives, appeals the District Court's denial of his summary judgment motion in this TCPA action brought by Andrew Perrong—a recipient of telephonic mass communications made on Representative Bradford's behalf. Perrong argues Bradford's telephonic mass communications to constituents regarding public health resources, employment opportunities, and upcoming events violate TCPA's prohibition on automated phone calls.  Bradford, in turn, argues his communications do not fall within TCPA's scope because general language prohibiting conduct by "any person" does not usually extend to the sovereign.  Even if his conduct

were encompassed, Bradford further argues Perrong's action would be barred by the Eleventh Amendment or by qualified immunity.

Because we agree that TCPA's robocalling restriction does not apply to calls made by state legislators, we will reverse the District Court's denial of summary judgment. As the statute does not encompass the conduct complained of, we express no opinion on whether the Eleventh Amendment or qualified immunity bars the suit at issue.

## I.

The Commonwealth of Pennsylvania appropriates funds to the Pennsylvania House of Representatives to provide for its operations and expenses. *See* Act 1A of 2024, S.B. 1001, § 262 (July 11, 2024). Pennsylvania House Rules permit Pennsylvania House Members, like Appellant Matthew Bradford, to expend allotted funds "for any legislative purpose or function." JA 405. The legislative purpose requirement must be satisfied for a House Member to be reimbursed with public funds for such expenditures. House Members commonly use these funds to promote legislative events, which can include mass communications through pre-recorded and

automated calls. [1]  These communications are at issue in this case.

House operations are carried out by employees of the House Caucuses based on party affiliation—namely, the House Democratic and Republican Caucuses.  As relevant here, since Bradford is a member of the Democratic Caucus ("the Caucus"), staffers in the Legislative Communications Office of the House Democratic Caucus ("Communications Office") assist with his mass communications.  If a House Member makes a request for a mass communication on a specific topic, the Communications Office prepares the scripts and makes logistical arrangements for the calls in coordination with the House Member's staff.  After the script is prepared, senior staffers in the Communications Office review the script to ensure its content is appropriate.  The Communications Office may also send any questionable call requests to House Legal and Ethics for compliance review.  Calls are approved if the Communications Office determines that the communications

---

[1]  Additionally, House Rules prohibit House Members from making mass communications within 60 days of a primary or general election or any other election in which the Member is a candidate.  And a temporary House Rule also permitted mass communications "limited to information directing constituents to public and private resources and services available to mitigate the impact" of the COVID-19 emergency, even during the pre-election restricted period.  JA 419.

further "a clear legislative purpose and public benefit."  JA 322.[2]

If the Communications Office determines a call does not have a legislative purpose, the call request is rejected, and the call may not be placed using House resources.[3]  For instance, a staffer testified that a former House Member's request for a mass communication congratulating the President on the passing of a federal statute was denied by the Communications Office for lacking a legislative purpose and was never placed.  Meanwhile, if a call is approved, the Caucus places the robocalls through a government contractor using public funds.

Perrong brings this TCPA action against Representative Bradford for five pre-recorded calls placed using an automated telephone dialing device.  The calls stated they were made by

---

[2] Perrong disputes whether the House Communications' procedure actually ensures the calls at issue further a clear legislative purpose.  Because the statutory question at issue does not turn on the standard for legislative purpose in the Pennsylvania House Rules, this fact is immaterial to our analysis.  We only note that House Staffers determined, to their satisfaction, that such calls further "a clear legislative purpose and public benefit."  JA 322.

[3] Perrong agrees calls must further a legislative purpose to be permissible but notes there is no evidence in the record that anyone "has [been] disciplined, reprimanded, or taken similar action against for engaging in, facilitating, or allowing allegedly unlawful or unauthorized calls to occur."  JA 254.

"State Representative Matt Bradford," and were approved, funded, and administered by the Communications Office through the process described above. JA 283–84. Perrong alleges these calls violate the statute's prohibition on calls made with an "automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1). The calls at issue concerned: (1) an upcoming information session about state government health insurance, (2) government resources available during the COVID-19 pandemic, (3) notification of government employment opportunities, (4) an upcoming shredding event for constituents, and (5) an upcoming family fair at a local zoo. Perrong seeks money damages against Bradford of up to $1,500 for each violation as per 47 U.S.C. § 227(b)(3).

Following discovery, Bradford brought a summary judgment motion in this action, arguing that TCPA does not apply to the conduct at issue, the claim was barred by Eleventh Amendment sovereign immunity, and he individually is protected under qualified immunity. The District Court, in relevant part, rejected these claims and denied summary judgment.

As to the statutory issue, the District Court held Bradford is a "person" subject to suit under TCPA because, although the term "person" usually excludes suits against officers in their official capacity as against the sovereign, the District Court determined that this is an individual capacity action against Bradford, making Bradford a "person" for purposes of statutory interpretation. The District Court noted the fact "Rep. Bradford may have been acting within the scope of his role as a state legislator when he made the calls does not make this an official capacity suit." JA 13. And, although

Perrong's Complaint is silent as to the capacity in which Bradford was sued, the District Court construed plaintiff's action as an individual capacity action because: (1) Bradford was listed as the defendant alongside his personal address in his Complaint, and (2) Perrong's relief was only sought against Bradford, not the state of Pennsylvania.

As to the Eleventh Amendment, the District Court recognized that sovereign immunity does not usually bar a claim made against an officer in his or her individual capacity. And the District Court ruled Pennsylvania is not the real party in interest in this action because Perrong's suit does not seek money damages from Pennsylvania and his requested relief would not "requir[e] the Commonwealth to change its own operations and procedures" since Bradford's decision to place the calls was a discretionary rather than mandatory one.  JA 13–14 (emphasis omitted).  Accordingly, the District Court held Eleventh Amendment immunity does not bar this individual capacity suit.

As to qualified immunity, the District Court determined that state legislators like Bradford may assert the defense of qualified immunity in TCPA actions.  But the District Court ruled that qualified immunity does not bar this suit on the grounds that TCPA's text was sufficiently obvious that Bradford should have known his conduct was encompassed by the statute's prohibition.  Bradford timely appeals the denial of summary judgment.

## II.

We begin, as we must, with the threshold question of jurisdiction.  The District Court had jurisdiction under 28

U.S.C. § 1331. We generally lack jurisdiction under 28 U.S.C. § 1291 to review interlocutory orders, such as a denial of summary judgment. *See Bines v. Kulaylat*, 215 F.3d 381, 384 (3d Cir. 2000). But the collateral order doctrine permits appellate review of a narrow category of interlocutory decisions that: (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) are "effectively unreviewable on appeal from a final judgment." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) (citation omitted). Denials of immunity commonly fall into this category. *See HIRA Educ. Servs. N. Am. v. Augustine*, 991 F.3d 180, 187–88 (3d Cir. 2021).

Here, the District Court ruled that Bradford was not entitled to qualified immunity due, in part, to the Court's holding that TCPA's robocalling prohibitions to state legislators are clearly established. And "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

The District Court also denied Bradford's claim of Eleventh Amendment immunity by holding the Commonwealth of Pennsylvania is not the real party in interest in this suit. And such a denial of Eleventh Amendment immunity, which turns on a question of law, "is immediately appealable under the collateral order doctrine, imbuing us with jurisdiction under 28 U.S.C. § 1291." *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 82 (3d Cir. 2016).

Since the denials of qualified and Eleventh Amendment immunity are appealable collateral orders, we may discretionarily exercise pendent appellate "jurisdiction over issues that are not independently appealable but [] are intertwined with" these orders over which we "properly and independently exercise[]" our jurisdiction. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 203 (3d Cir. 2001). We have exercised pendent appellate jurisdiction when (1) "an otherwise non-appealable order is inextricably intertwined with an appealable order," or (2) it is "necessary to ensure meaningful review of the appealable order." *OI Eur. Grp. B.V. v. Bolivarian Republic of Venez.*, 73 F.4th 157, 176 (3d Cir. 2023) (citation modified).

Because whether a statute clearly expresses a cause of action against a state actor is "logically antecedent to" the question of sovereign immunity, *see Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 779 (2000) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997)), these issues are sufficiently intertwined that we may exercise "pendent appellate jurisdiction over the statutory question," *id.* at 770 n.2 (citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 50–51 (1995)). Thus, "it is appropriate to decide whether a statute permits a cause of action against a State before deciding whether the Eleventh Amendment bars the suit." *Broselow v. Fisher*, 319 F.3d 605, 607 (3d Cir. 2003) (citation omitted). And, if the statute does not clearly express an intent to cover the state conduct, we need not address immunity altogether. *Vt. Agency of Nat. Res.*, 529 U.S. at 779, 787.

When reviewing a district court's ruling on summary judgment, "the Court of Appeals' review is plenary and the court should apply the same test the district court should have utilized initially." *Wharton v. Danberg*, 854 F.3d 234, 241 (3d Cir. 2017) (internal quotation marks and citation omitted). Summary judgment is granted when the record shows "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

### A.

TCPA includes a broad restriction on robocalls, prohibiting "any person" from "mak[ing] any call . . . using any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). The statute was passed in response to "a torrent of vociferous consumer complaints about intrusive robocalls." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 614 (2020) (plurality opinion). At the time, consumers expressed "outrage[] over the proliferation of intrusive, nuisance calls"—preceding TCPA, over 300,000 solicitors called more than 18 million Americans daily. TCPA, §§ 2(3), 2(6), 105 Stat. 2394. And "federal legislation was needed because telemarketers, by operating interstate, were escaping state-law prohibitions on intrusive nuisance calls." *Mims v. Arrow Fin. Servs.*, 565 U.S. 368, 371 (2012). Congress ultimately determined that "[b]anning" robocalls was necessary to address "th[e] nuisance and privacy invasion" caused by "automated or prerecorded telephone calls, regardless of the content or the initiator of the message." TCPA, §§ 2(10), 2(12), 105 Stat. 2394. Thus,

TCPA was adopted and amended the Communications Act of 1934 ("Communications Act") to add such a prohibition. TCPA, 105 Stat. 2394.

TCPA includes a private cause of action for violations of the statute. 47 U.S.C. § 227(b)(3). A plaintiff can recover at least $500 in damages for each call made in violation of the robocalling prohibition. *Id.* § 227(b)(3)(B). And a district court may award treble damages for a willful or knowing violation of the statute. *Id.* § 227(b)(3)(C). The statute also provides for injunctive relief to prevent future violations. *Id.* § 227(b)(3)(A).

Although the statute's scope is extensive and the enforcement mechanism is robust, TCPA also gives the Federal Communications Commission ("FCC") ample flexibility to exclude robocalls from TCPA's scope through the administrative process. *See* 47 U.S.C. § 227(b)(2)(B)–(C). And this flexibility was central to the successful passage of the Act. Statement on Signing the Telephone Consumer Protection Act of 1991, 27 Weekly Comp. Pres. Doc. 1877 (Dec. 20, 1991) ("I have signed the bill because it gives the Federal Communications Commission ample authority[.]").

## B.

The applicability of TCPA to the government has long been a subject of debate. The Bill was initially drafted with an exemption for calls made by a "public school or other governmental entity." S. Rep. 102-178, at 5 (Oct. 8, 1991). But that provision was removed and replaced with "an exception for 'any emergency purposes,'" *id.*, such as to "publish health and safety warnings," H.R. Rep. 102-317, at 25

(Nov. 15, 1991).  In 2016, the Supreme Court ruled federal government contractors are not entitled to sovereign immunity from TCPA liability when they "violate[] both federal law and the Government's explicit instructions." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016).  The Court stressed there is no sovereign immunity when "a Government agent ha[s] 'exceeded his authority' or the authority 'was not validly conferred.'" *Id.* at 167 (quoting *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21 (1940)).

Following *Campbell-Ewald*, the FCC issued a declaratory ruling, expressing its interpretation that the term "person" in TCPA nonetheless excludes federal government callers and contractors in the conduct of official government business. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. 7394, 7394 (2016) ("*Broadnet I*").  In relevant part, the FCC emphasized "robocalls . . . when made by federal legislators . . . are not subject to the TCPA's robocall consent requirement, as long as the robocalls are conducted in the legislator's official capacity and not, for example, as part of a campaign for re-election." *Id.* at 7399.  In light of the difficulty of cohering the FCC's interpretation with that in *Campbell-Ewald*, the FCC issued a revised interpretation in 2020. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 35 F.C.C. Rcd. 15052 (2020) ("*Broadnet II*").  The FCC reversed its position, in part, and agreed that government contractors are not excluded from TCPA's scope. *Id.* at 15056.  But the FCC retained its interpretation that federal government callers are excluded and determined "state government callers in the conduct of official business [] do not fall within the meaning of 'person' in section 227(b)(1)" as well. *Id.* at 15059. Several

Commissioners dissented with this interpretation as applied to state government callers. *Id.* at 15072–75.

Post-enactment discussion of the applicability of TCPA to government callers was not limited to the FCC but also continued in the halls of Congress. In 2015, Congress amended TCPA to exclude any call "made solely to collect a debt owed to or guaranteed by the United States." Bipartisan Budget Act of 2015, § 301(a)(1), 129 Stat. 588 (2015). And one FCC Commissioner noted Congress' inclusion of this provision seemed inconsistent with the FCC's existing interpretations of the statute—"if the federal government is truly outside the scope of the Telephone Consumer Protection Act, it is unclear why Congress would need to have specifically provided a debt-related exception to the law in the first place." *Broadnet I*, 31 F.C.C. Rcd. at 7394 (Statement of Commissioner Jessica Rosenworcel, concurring). Ultimately, the 2015 Amendment was severed from the statute after the Supreme Court ruled that provision unconstitutionally favored government speech. *See Barr*, 591 U.S. at 636. And, in that case, one Justice suggested the statute does not apply to government callers. *Id.* at 637 (Sotomayor, J., concurring in judgment) (suggesting the statute would not be implicated if the government had "plac[ed] the calls itself" (quoting *Am. Ass'n of Pol. Consultants, Inc. v. FCC*, 923 F.3d 159, 169 n.10 (4th Cir. 2019))).

At least two circuits have addressed the applicability of TCPA to government callers. In *Cunningham v. Lester*, the Fourth Circuit held federal sovereign immunity barred a suit against government contractors calling on behalf of the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS"). 990 F.3d 361, 365

(4th Cir. 2021). There, CMS relied on government contractors to fulfill a statutory obligation to provide "notice of eligibility for an applicable State health subsidy program." 42 U.S.C. § 18083(b)(2). And, if relief was granted, CMS would be forced to "implement[] a functional replacement" for using contractors to provide the statutorily mandated notice because a ruling for plaintiffs would void the existing government contracts for automated calls. *Cunningham*, 990 F.3d at 368. Thus, the Fourth Circuit ruled sovereign immunity barred the suit because the United States was the real party in interest since the judgment would "operate" against the sovereign. *Id.* at 367.

In *Cheng v. Speier*, the Ninth Circuit, in an unpublished opinion, addressed the applicability of TCPA to calls by federal legislators. No. 22-16170, 2023 WL 4490352 (9th Cir. July 12, 2023). There, the Ninth Circuit granted *Chevron* deference to the FCC's interpretation in *Broadnet II* and thereby ruled that federal legislators conducting official business do not constitute a "person" under TCPA. *Id.* at *1. Judge Bress authored a dissenting opinion, arguing the court should have alternatively ruled that sovereign immunity does not preclude TCPA relief against federal legislators and remanded on the statutory issue. *Id.* at *3 (Bress, J., dissenting). Following *Cheng*, the Supreme Court has overruled the deference framework established in *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

Unlike *Cunningham*, which concerned federal contractors, and *Cheng*, which concerned federal congressmen, this case raises a question of first impression—whether state

legislators are encompassed by TCPA's robocalling prohibition.

## IV.

TCPA prohibits "any person" from "mak[ing] any call . . . using any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). And this "robocall restriction applies to 'persons,' which does not include the Government itself." *Barr*, 591 U.S. at 615 n.1. Indeed, there is a "longstanding interpretive presumption that 'person' does not include the sovereign" when used in a statute. *Vt. Agency of Nat. Res.*, 529 U.S. at 780. This presumption, however, "is not a 'hard and fast rule of exclusion'" and "may be disregarded upon some affirmative showing of statutory intent to the contrary." *Return Mail, Inc. v. U.S. Postal Serv.*, 587 U.S. 618, 627 (2019) (citations omitted); s*ee also Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 83 (1991) ("[O]ur conventional reading of 'person' may . . . be disregarded if '[t]he purpose, the subject matter, the context, the legislative history, [or] the executive interpretation of the statute . . . indicate an intent, by the use of the term, to bring state or nation within the scope of the law.'" (citation omitted) (second and third alterations in original)).

The presumption of sovereign exclusion has many bases. "Th[e] presumption reflects 'common usage.'" *Return Mail*, 587 U.S. at 627 (quoting *United States v. Mine Workers*, 330 U. S. 258, 275 (1947)). It is supported by the Communication Act's definition of a "person," 47 U.S.C. § 153(39), which fails to include the government in its definitional list, suggesting the sovereign is excluded under *expressio unius est exclusio alterius*. *See Return Mail*, 587

U.S. at 627 (noting the failure to include the government in a definitional list of a federal statute presumes the government is excluded).[4]  And it is a long-established principle of American common law.  *See United States v. Hoar*, 26 F. Cas. 329, 330 (C.C.D. Mass. 1821) (Story, J.) ("[It is] a safe rule founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act.").

In the context of a state sovereign, the canon also has its basis in "'the ordinary rule of statutory construction' that 'if Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.'"  *Vt. Agency of Nat. Res.*, 529 U.S. at 787 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)).  And the presumption furthers "the doctrine that statutes should be construed so as to avoid difficult constitutional questions."  *Id.*  Thus, the canon is "particularly applicable where it is claimed that Congress has subjected the States to liability to which they had not been subject before."  *Id.* at 781 (quoting *Will*, 491 U.S. at 64).

"The rule of exclusion of the sovereign is less stringently applied where the operation of the law is upon the agents or servants of the government rather than on the sovereign itself."  *Nardone v. United States*, 302 U.S. 379, 383 (1937).  And the scope of the exclusion, *i.e.,* whether an

---

[4] TCPA is a component of the Communications Act of 1934. *See* TCPA, 105 Stat. 2394.

instrumentality, agent, or employee of the sovereign constitutes a "person," relies heavily on the "context" of the statute. *Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 127 (2003) (citation omitted).[5] "Context is not found exclusively within the four corners of a statute." *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (citation modified). "Background legal conventions, for instance, are part of the statute's context." *Id.* at 511–12. Here, we examine the context of TCPA to determine whether the term "person" not only excludes the Commonwealth of Pennsylvania from the statute's scope but also Pennsylvania state legislators when performing entirely legitimate functions of their office.

A.

The Supreme Court last substantially discussed the scope of the presumption as applied to government employees in *Nardone v. United States*, 302 U.S. 379 (1937), which interpreted a provision in the Communications Act of 1934, of which TCPA is a part. There, the Court held the prohibition in the Communications Act that "no person" shall wiretap in the Communications Act applies to federal agents. *Id.* at 380–81, 383. And, thus, the statute's prohibition on "any person" divulging wiretapped content precludes a federal court from considering wiretapped evidence proffered by federal officers. *Id.* at 381. But the Court also recognized the term "person"

---

[5] The Communications Act defines "person" as "an individual, partnership, association, joint-stock company, trust, or corporation," 47 U.S.C. § 153(39), "unless the *context* otherwise requires," *id.* § 153 (emphasis added).

can, in other instances, exclude government officers when used in a statute. *Id*. at 384. The case provided an illustrative example—if a statute prohibited any person from driving over a speed limit, it would clearly not apply to a police officer in pursuit of a criminal or a firefighter responding to an alarm. *Id.* In these instances, a statute's context demonstrates including government officers "would work obvious absurdity." *Id.*

Although prior construction and consistent usage may then suggest the term "person" should be read similarly in TCPA as it has been in other parts of the Communications Act, "[t]his principle . . . 'readily yields to context.'" *Return Mail*, 587 U.S. at 629 (quoting *Util. Air RegulReg. Grp. v. EPA*, 573 U.S. 302, 320 (2014)). And such context includes "clear-statement federalism rules." *Nebraska*, 600 U.S. at 508 (Barrett, J., concurring).

## B.

Our Constitutional design ensures that States "retai[n] a significant measure of sovereign authority." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 549 (1985) (citation omitted) (alteration in original); *see also* U.S. Const. Amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). And a state's sovereign interests are particularly implicated when the functions of its state government—especially, its state legislature—are impaired, impeded, or called into question. As the Supreme Court has long cautioned:

> [T]he Constitution of the United States . . . recognizes and preserves the autonomy and

independence of the States—independence in their legislative and independence in their judicial departments. [Federal] [s]upervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specifically authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the State and, to that extent, a denial of its independence.

*Garcia*, 469 U.S. at 549–50 (alterations in original) (quoting *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938)). To preserve these sovereign interests, the federal government may not, in most circumstances, "dictate[] what a state legislature may and may not do." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018). Indeed, "[a] more direct affront to state sovereignty is not easy to imagine." *Id.*

In light of these principles, state legislators enjoy broad absolute immunity from civil liability when engaging in core legislative activities. *See Youngblood v. DeWeese*, 352 F.3d 836, 839 (3d Cir. 2003). But not all of a state legislator's duties are directly "related to the due functioning of the legislative process." *Id.* at 840 (citation omitted). And federal common law does not afford state legislators immunity for "a wide range of legitimate 'errands' performed for constituents," including "preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress." *Id.* (quoting *United States v. Brewster*, 408 U.S. 501, 512 (1972)). Nevertheless, communication with constituents is a central and "entirely legitimate" aspect of a legislator's role. *Brewster*,

408 U.S. at 512.   As amici Pennsylvania Republican and Democratic Caucuses stress: "communications . . . on these issues are a regular part of the official business done by" state legislators.   Republican and Democratic Caucuses of the Pennsylvania State Senate and Republican Caucus of the Pennsylvania House of Representatives Amicus Br. 9.

We are hesitant to conclude Congress has prohibited state legislators from exercising these entirely legitimate functions of their office when "they had not been subject before" to "liability" for such acts.  *Vt. Agency of Nat. Res.*, 529 U.S. at 781 (citation omitted).  And, "if Congress intends to alter the usual constitutional balance between States and the Federal Government" in such a manner, we expect it to make its "intention to do so unmistakably clear in the language of the statute.'"   *Id.* at 787 (citation omitted).   Based on the presumption of sovereign exclusion, the general language of "any person" in § 227(b)(1) does not suffice.  *See id.*

## C.

The contextual considerations that caution against extending general prohibitory language to encompass a state legislator's legitimate functions are reflected in the Supreme Court's jurisprudence regarding 42 U.S.C. § 1983, which similarly imposes liability on "every person" for a violation. In the context of § 1983, the Supreme Court recognizes a state officer can be subject to liability as a "person" even when performing government functions.  *See Hafer v. Melo*, 502 U.S. 21, 27 (1991) ("A government official in the role of personal-capacity defendant [] fits comfortably within the statutory term 'person.'"); *Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued

for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." (citation and internal quotation marks omitted)). But, although they are also state officers, state legislators are subject to a different rule. *See Tenney v. Brandhove*, 341 U.S. 367, 378 (1951).

In *Tenney*, a § 1983 suit was brought against state legislators who served on a legislative investigatory commission that allegedly sought "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights." *Id.* at 371. The Court determined the "general language" of "every person" in § 1983 should not be read to "subject legislators to civil liability for [such] acts done within the sphere of legislative activity." *Id.* at 369, 376. Rather, our legislative context reflects "a tradition [] well grounded in history and reason" that "Congress" is "a staunch advocate of legislative freedom" and does not limit it in a statute "by covert inclusion in [] general language." *Id.* at 376. Thus, the Court construed the term "person" in § 1983 such that it "does not create civil liability for such conduct" by state legislators. *Id.* at 369, 379. As the dissenting opinion noted, state legislators are thus excluded from general liability in a manner "[n]o other public official" is. *Id.* at 382 (Douglas, J., dissenting).

Section 1983, with its "under color" of state law language, was "intended to radically alter the distribution of power between the federal government and the states." *Larsen v. Senate of Com. of Pa.*, 152 F.3d 240, 248 (3d Cir. 1998). TCPA, on the other hand, was primarily precipitated by "[t]he use of the telephone to market goods and services." TCPA, § 2(1), 105 Stat. 2394. Thus, TCPA's context suggests that

Congress did not "intend[] to alter the usual constitutional balance between States and the Federal Government." *Vt. Agency of Nat. Res.*, 529 U.S. at 787 (citation omitted); *see also id.* at 781 (noting the presumption of sovereign exclusion "may be disregarded only upon some affirmative showing of statutory intent to the contrary").

## D.

We do not cast doubt on the power of Congress to exercise powers "specifically authorized or delegated" to it. *Garcia*, 469 U.S. at 549 (citation omitted). But our constitutional structure "was designed in large part to protect the States from overreaching by Congress." *Id.* at 551. We are thus hesitant to assume Congress would go so far as to hinder state legislators from communicating with their constituents by simply using the general prohibitory language in § 227(b)(1), especially when Pennsylvania House staff have decided these communications have "a clear legislative purpose and [serve the] public benefit." JA 322. It would be a "big assumption" to presume Congress would "limit the freedom of State legislators" in this fashion. *Tenney*, 341 U.S. at 376. "It is a sound and important principle that the representative ought to be acquainted with the interests and circumstances of his constituents." Federalist No. 56, at 379 (Hamilton) (Jacob E. Cooke ed., 1961). And this remains especially true for "the state legislature, where all the local information and interests of the state are assembled." *Id.* at 380. Context suggests Congress would not "impinge on a tradition so well grounded in history and reason." *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (quoting *Tenney*, 341 U.S. at 376).

Indeed, we hesitate to impose liability on state legislators when they act "not for their private indulgence but for the public good." *Tenney*, 341 U.S. at 377. Here, it is evident that the calls were made for the "public benefit," JA 322, rather than "private indulgence," *Tenney*, 341 U.S. at 377. In one call, Bradford advertised an event "to help [constituents] connect to [a] health care coverage plan." JA 283. In another call, Bradford informed constituents of an employment opportunity to "become a part of the 2020 census team and earn 27 dollars an hour." JA 284. A third call informed constituents of a "document shredding event" hosted by Bradford "to help protect [constituents'] identity and get rid of those old documents taking up space." JA 283. A different call notified constituents that Bradford's office "can assist with questions on unemployment compensation, resources for small businesses and help [constituents] access government services" during the Covid-19 pandemic. JA 284. And another call let constituents know that Bradford was "hosting a Family Fair for residents of the 70th district" at a local zoo. JA 283. Such communications related to the health, safety and general welfare of the people clearly serve the "public good"—as opposed to any personal affairs or a re-election campaign. *Tenney*, 341 U.S. at 377. It is thus unsurprising that House Employees authorized them as being made for the "public benefit." JA 322.

In light of these considerations, we cannot conclude, as Appellee asks, that Congress through TCPA's general robocall restriction sought to restrict or "prevent a state legislature from expressing its views on [these] subjects of public importance." *Murphy*, 584 U.S. at 483. "[S]tatutes should be construed so as to avoid" such "difficult constitutional questions." *Vt. Agency of Nat. Res.*, 529 U.S. at 787. If Congress expected us

to disregard this context and assume it had "significantly alter[ed] the balance between federal and state power," it would have "enact[ed] exceedingly clear language." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). Here, the term "person" in § 227(b)(1) is not so "unmistakably clear" that we can presume Congress restricted state legislators from carrying out these legitimate functions of their office. *Vt. Agency of Nat. Res.*, 529 U.S. at 787 (citation omitted).

### E.

Because TCPA does not encompass Bradford's legitimate functions as a state legislator, we need not opine on how the term "person" in § 227(b)(1) applies to other government officials. Nor do we opine on whether the FCC's interpretation of "person" in § 227(b)(1) should be entitled to *Skidmore* deference.[6] But we do emphasize that TCPA gives the FCC "the flexibility" to exclude "automated or prerecorded

---

[6] The FCC is the implementing agency of TCPA. 47 U.S.C. § 227(b)(2). Thus, we analyze its interpretation of TCPA under the framework established in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See Loper Bright*, 603 U.S. at 388.

calls that it finds are not considered a nuisance or invasion of privacy." TCPA, § 2(13), 105 Stat. 2394.[7]

Furthermore, since TCPA does not provide a cause of action against Bradford for these calls, we do not opine on whether Eleventh Amendment immunity bars the claims against Bradford or if the Commonwealth of Pennsylvania is the real party in interest in this suit. *See Vt. Agency of Nat. Res.*, 529 U.S. at 787.

Our holding today is a narrow one: § 227(b)(1)'s robocall restriction, by using the general term "person," does not encompass calls made by state legislators when exercising legitimate functions of their office for the public benefit.

---

[7] TCPA grants the FCC the authority to exempt certain calls from TCPA's robocalling prohibition. 47 U.S.C. § 227(b)(2)(B)–(C). But any exemptions made by the FCC must specify: "(i) the classes of parties that may make such calls; (ii) the classes of parties that may be called; and (iii) the number of such calls that a calling party may make to a particular called party." *Id.* § 227(b)(2)(I). Currently, the FCC has not explicitly exempted calls by government officials as a class using this administrative procedure. *See In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 35 F.C.C. Rcd. 15188, 15192 (2020) (listing exempted calls and callers).

## V.

Because the calls made by Pennsylvania House Representative Bradford are not encompassed by § 227(b)(1), we will reverse.